IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

VISTA-GRAPHICS, INC., ET AL.,

    Plaintiff

v.                           CIVIL NO. 2:15cv363

VIRGINIA DEPARTMENT OF
TRANSPORTATION ET AL.,

    Defendant.

## OPINION AND ORDER

This suit was filed by Vista-Graphics, Inc. and Randal W. Thompson, its president,

("Plaintiffs") in the Circuit Court of Accomack County, Virginia, pursuant to 42 U.S.C. § 1983.

Compl., ECF No. 1-1. Plaintiffs have challenged the State of Virginia's management of the

informational materials and advertisements displayed in the state-owned Welcome Centers and

Rest Areas,[1] which are located on various highways throughout the state. Plaintiffs filed suit in

Accomack County because the county contains a Welcome Center, which is located on U.S.

Route 13 near the Virginia/Maryland border. See ECF No. 12-1, Ex. A. The suit was then

removed to the United States District Court for the Eastern District of Virginia. ECF No. 1.

Plaintiffs brought this action against the Virginia Department of Transportation ("VDOT"), the

Virginia Tourism Corporation ("VTC"), Aubray L. Layne in his official capacity as Secretary of

Transportation, and Charles A. Kilpatrick in his official capacity as Commissioner of VDOT

(collectively, "Defendants"). First Am. Compl., ECF No. 12. Plaintiffs also sued Highway

---

[1] Throughout this opinion the Court, for brevity, will refer primarily to the Welcome Centers rather than to the Welcome Centers and Rest Areas. The Court's analysis applies to both.

1

Information Media, LLC ("HIM") "solely as a party in interest." Id. ¶ 6. HIM has not responded to the lawsuit.

Defendant filed a Motion to Dismiss the initial complaint, which was granted. Order, ECF No. 11. Plaintiffs were permitted leave to file an Amended Complaint, which they have filed. First Am. Compl., ECF No. 12. Defendants have filed a Motion to Dismiss Plaintiffs' First Amended Complaint. ECF No. 14. This Motion has been fully briefed. ECF Nos. 15–17. The Court **GRANTS** the motion and **DISMISSES** the present action for the reasons hereinafter set forth. ECF No. 14.

## I.    BACKGROUND

### A.    PROCEDURAL HISTORY

Plaintiffs initially brought this action in in the Circuit Court for Accomack County. See Compl., ECF No. 1-1. Defendants removed the case to federal court, ECF No. 1, and filed a Motion to Dismiss. ECF No. 5. After briefing was completed, the Court held a hearing on the motion on October 6, 2015. ECF No. 10. At this hearing, the parties discussed all aspects of Defendants' Motion, including Defendants' claims that Plaintiffs lacked standing to bring their complaint and that the Welcome Center displays constitute government speech, immune from First Amendment challenge. Id. In an Order issued on October 21, 2015, the Court granted Defendants' Motion to Dismiss. ECF No. 11. The Court held that Plaintiffs' complaint failed to plead an injury-in-fact and as a consequence failed to establish that Plaintiffs had standing to challenge the restrictions on what could be displayed in the Welcome Centers. Id. at 3. However, because at argument Plaintiffs' counsel referenced several facts unmentioned in the complaint that might support their claims of standing, the Court granted leave to amend. Id. at 3–4. The Court also noted in its Order that Plaintiffs likely had standing to challenge the fees charged to display the materials and that this issue would better be addressed with Plaintiffs' other claims in

2

the amended complaint. Id. at 3 n.1.

Plaintiffs timely filed their First Amended Complaint on November 11, 2015. ECF No. 12. On November 24, 2015, Defendants filed a Motion to Dismiss. ECF No. 14. Plaintiffs filed their Brief in Opposition on December 12, 2015, ECF No 16, and Defendants their Rebuttable Brief on December 7, 2015. ECF No. 17. Because the issues raised in the instant Motion to Dismiss Plaintiffs' First Amended Complaint were thoroughly argued during the October 6, 2015 hearing concerning Defendants' first Motion to Dismiss, the Court finds that there is no need for an additional hearing.

### B.    FACTS ALLEGED IN THE FIRST AMENDED COMPLAINT

The following factual summary is taken from the allegations contained in Plaintiffs' First Amended Complaint, which, for purposes of ruling on the instant Motion to Dismiss, the Court accepts as true. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

Plaintiff Vista-Graphics publishes guides for visitors to Virginia such as Virginia Beach Visitors Guide and GoWilliamsburg Visitors Guide. First Am. Compl. ¶ 1. Co-plaintiff Randal W. Thompson is the president and owner of Vista-Graphics. Id. ¶ 2. The guides contain listings of "lodging, attractions, restaurants and other products and services" along with advertisements. Id. ¶¶ 1, 22–23. Plaintiffs have for the past eight years placed these guides in various state-run Welcome Centers and Rest Areas. Id. ¶ 22. Plaintiffs' present suit challenges the constitutionality of a subsection of the Virginia Administrative Code, 24 VAC 30-50-10(L), and two state programs that allegedly govern the display of Plaintiffs' guides in the State Welcome Centers and Rest Areas: the Sponsorship, Advertising, and Vending Enhancement ("SAVE") program and the Partnership Marketing and Advertising Program ("PMAP"). Id. at 1.

Because of budget shortfalls, Virginia had been forced to close some Welcome Centers

3

and Rest Areas beginning in 2009.[2] Virginia instituted the SAVE program in 2012 in order to generate revenue and make the Welcome Centers and Rest Areas more self-sufficient. First Am. Compl. ¶¶ 8–9; see generally Advertising Opportunities At Virginia Welcome Centers, ECF No. 12-3, Ex. C (describing the SAVE program and listing different ways that businesses may advertise at the Welcome Centers). Prior to the implementation of the SAVE program, Vista-Graphics was able to place its guides free of charge in the Welcome Centers and Rest Areas, which were then run by VDOT. First Am. Compl. ¶¶ 8, 10. After the institution of the program, VDOT through its contractor Highway Information Media, LLC ("HIM"), began requiring Vista-Graphics to pay fees to place materials in the Welcome Centers and Rest Areas. Id. ¶ 10.

The challenged provision of the Virginia Administrative Code, 24 VAC 30-50-10(L), regulates "waysides and rest areas" and provides in part that

> No threatening, abusive, boisterous, insulting or indecent language or gesture shall be used within this area. Nor shall any oration, or other public demonstration be made, unless by special authority of the commissioner.

Id. ¶ 15. Plaintiffs argue—and Defendants do not appear to dispute—that the "waysides and rest areas" covered by this regulation are in some instances the same spaces managed under the SAVE and PMAP programs.[3] See id. (alleging that the SAVE program and 24 VAC 30-50-10(L) create two different sets of rules governing Welcome Centers). They allege that the restrictions contained in 24 VAC 30-50-10(L) are unconstitutionally overbroad and vague and that vesting "final decision authority in a single public official (i.e. 'the commissioner') without meaningful guiding standards or procedures" or a right to appeal violates the due process guarantees in the

---

[2] See generally Ashley Halsey III, Virginia Prepares to Close Highway Rest Areas, WASH. POST, Jul. 9, 2009, http://www.washingtonpost.com/wp-dyn/content/article/2009/07/07/AR2009070701335.html; Anita Kumar, Virginia to Reopen 19 Highway Rest Stops, WASH. POST, Jan. 21, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/01/20/AR2010012004693.html.

[3] Defendants note that 24 VAC 30-50-10(L) was "promulgated pursuant to authority found in § 33.2-2.10 and § 33.2-246 of the Code of Virginia (1950), as amended, and the subject matter is Waysides and Rest Areas for VDOT." Mem. of Law in Supp. of Mot. to Dismiss, 1 n.2, ECF No. 15.

State and Federal Constitutions. Id. ¶ 15.

Plaintiffs allege that three separate documents control the administration of the SAVE and PMAP programs and that each of these documents contains unconstitutional restrictions on what materials may be placed in the Welcome Centers. On March 29, 2013, VDOT issued the first of these documents, which is captioned "VDOT Implementation of Rest Area Revenue Generating Programs" ("VDOT Implementation"). Id. ¶ 14; see also VDOT Implementation, ECF No. 12-5, Ex. E. Plaintiffs allege that the restrictions contained in this document are unconstitutional both because they are content based restrictions on speech and because they are overbroad and vague. First Am. Compl. ¶ 14. As an example of the alleged unconstitutionality, Plaintiffs cite to a provision that limits the "subject matter" of "advertisements and other similar media" to "commercial speech, VDOT or government information (e.g. maps, 511 traffic monitoring program) relating to highways, the safety and welfare of the traveling public, and other activities of the commonwealth." Id.; see also VDOT Implementation at 3. The document also forbids "subject matter that . . . states or implies that the Commonwealth or any of its agencies endorse a commercial vendor product or service." Id.

The second document is a contract the Virginia Tourism Corporation ("VTC") and HIM entered into on June 1, 2015. First Am. Compl. ¶ 16; Virginia Tourism Corporation Standard Contract ("VTC Contract"), ECF No. 12-7, Ex. G. This contract governs HIM's management of the Welcome Centers and Rest Areas. Id. This contract obligates HIM to follow several "General Rules and Restrictions for Advertising," which apply to HIM's uses of the contractual rights licensed to it, including the right to display brochures in the Welcome Centers. First Am. Compl. ¶ 16; VTC Contract, §§ (A)(2)(d)(2)(c), (A)(2)(h), at 3,4. Among the restrictions are prohibitions on displaying advertising for "political candidates or political purposes" or for "religious

purposes." First Am. Compl. ¶ 16; VTC Contract, §§ (A)(2)(h)(3), (A)(2)(h)(5), at 4–5. Plaintiffs argue that the restrictions contained in the contract are "vastly overbroad, unduly vague," inconsistent with state regulations, and "offend the free speech provisions of the United States and Virginia Constitutions." First Am. Compl. ¶ 17. They also argue that the authority granted to VTC under the contract violates "due process and equal protection rights." Id.

The third and final document was released by VTC on June 1, 2015, and is titled, "Virginia Welcome Centers & Safety Rest Areas Partnership Marketing & Advertising Program Policies" ("PMAP Policies"). First Am. Compl. ¶ 18; PMAP Policies, ECF No. 12-8, Ex. H. The release describes the administration of the PMAP program that was being implemented through the VTC and HIM partnership. Id. The document, like the partnership contract, restricts what may be contained in advertisements "displayed or distributed" at the Welcome Centers under the heading "Disqualified Content." First Am. Compl. ¶ 18; PMAP Policies, ECF No. 12-8, Ex. H, at 9. For instance, the document forbids "political or religious advertisement." Id. Plaintiffs again object to the State's inconsistent rules governing the Welcome Centers, to the "policies controlling speech," and the lack of "due process mechanisms." First Am. Compl. ¶ 20.

Plaintiffs' complaint alleges that the policies of the SAVE and PMAP programs are not only inconsistent with each other and with 24 VAC 30-50-10(L), but also with 24 VAC 30-151-670 (2). Id. ¶¶ 12, 17, 21. This portion of the Virginia Administrative Code provides that

> Vendors of newspapers and written materials enjoy constitutional protection under the First Amendment to place or operate their services within rights-of-way, provided that they neither impede traffic nor impact the safety of the traveling public.

24 VAC 30-151-670(2). According to Plaintiffs, "[w]elcome centers and rest areas have traditionally allowed business such as Vista-Graphics to distribute printed materials without charging for this right, ostensibly because free speech protections afforded by the United States

and Virginia Constitutions, as recognized by 24 VAC 30-151-670(2)." Id. ¶ 12.

In three paragraphs that contain allegations new to the Amended Complaint, Plaintiffs elaborate on how the various regulations on what may be displayed in the Welcome Centers have affected them. Id. ¶¶ 22–24. They allege that in the eight plus years that they have supplied the Welcome Centers with information they have included material that would violate the current restrictions. Id. ¶ 22. For instance, they have included political and religious materials in their travel guides. Id. The Plaintiffs allege that they "may currently be in violation of the ban on religious advertisements because they generally list 'places of worship.'" Id. Plaintiffs allege that because of the restrictions they "have engaged in self-censorship and have refrained from soliciting and distributing many forms of information and advertising." Id. ¶ 23. As example, Plaintiffs allege that they

> would like to solicit, draft, publish and display materials that: (1) solicit donations, (2) advertise commercial or residential real estate, (3) provide ratings and opinions relating to various businesses and services, (4) advertise properties with membership requirements, (5) advertise liquor and tobacco products, and (6) constitute political and religious advertisements and messages.

Id. All of these materials would be prohibited by one or more of the just described documents that allegedly implement the SAVE and PMAP programs. See id. ¶¶ 14, 16–18. They are forced to self-censor because they do not know the consequences of being in violation of the rule. Id. ¶ 24. Specifically, Plaintiffs worry that it may damage their reputation if they solicit advertisements and then are unable to publish them because of the restrictions. Id.

In addition to these new allegations of injury, Plaintiffs allege again without specific facts that

> they have been forced to: (1) pay significant fees (totaling more than $80,000 to date, and climbing) well above mere administrative or maintenance costs, (2) contend with uneven and unequal enforcement of SAVE and PMAP program rules and restrictions, (3) endure excessive burdens, threats and restrictions in

attempting to exercise free speech rights, (4) contend with content rules and restrictions that are vague, confusing and contradictory, and (5) endure a regulatory scheme that denies due process.

Id. ¶ 25.

## II.   STANDARD OF REVIEW

The function of a motion to dismiss is to test "the sufficiency of a complaint." Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013). A court must consider "the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). A motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive such a motion, the complaint must allege facts sufficient 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" Haley, 738 F.3d at 116. When reviewing the legal sufficiency of a complaint, a court must accept "all well-pleaded allegations in the plaintiff's complaint as true" and draw "all reasonable factual inferences from those facts in the plaintiff's favor." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). Legal conclusions, on the other hand, are not entitled to the assumption of truth if they are not supported by factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## III.   PLAINTIFFS' CLAIMS

Plaintiffs attack the State's management of the Welcome Centers under the First Amendment, the due process and equal protection clauses of the Fourteenth Amendment, and assorted provisions of state law. Under the First Amendment they challenge two distinct aspects of the State's management of the Welcome Centers: they allege that the policies governing what may be displayed in the welcome centers are overbroad, vague, and content-based restrictions on speech, and they allege that the fees are unconstitutionally excessive and so burden their speech

8

rights. Their due process and equal protection claims challenge the procedures used to approve or deny materials for placement in the Welcome Centers. Plaintiffs' claims for relief under state law are less defined. They allege that 24 VAC 30-50-10(L), the SAVE program, and the PMAP program are inconsistent with each other and with 24 VAC 30-151-670(2). They also allege that the Commonwealth's policies concerning the Welcome Centers violate the provisions of the State Constitution that correspond to the Federal Constitution's protections of free speech and due process but do not argue that the scope of these state constitutional provisions differ from the federal protections.

In support of their Motion to Dismiss Plaintiffs' First Amended Complaint, Defendants raise the same defenses that they raised in support of their Motion to Dismiss Plaintiffs' initial complaint. They argue that (1) there is no case or controversy because Plaintiffs lack standing and the dispute is not ripe for adjudication; (2) the Welcome Center displays are government speech not subject to the protections of the First Amendment; (3) the displays, if not government speech, are limited public forums and subject to less stringent constitutional protections; (4) none of the state defendants are proper parties to this litigation; and (5) Plaintiffs do not state a claim for injunctive relief. See Mem. in Supp. of Mot. to Dismiss, ECF No. 15.

### A.    FIRST AMENDMENT: RESTRICTIONS ON WELCOME CENTER DISPLAYS

Before the Court can determine if Plaintiffs state a claim for relief with their challenge to the restrictions on what may be placed in the Welcome Centers, it must first determine if Plaintiffs have standing to bring this claim. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93–95 (1998). In their First Amended Complaint, Plaintiffs have added new allegations of injury on account of the restrictions governing the Welcome Center displays. First Am. Compl. ¶¶ 22–24. Although these allegations contain more factual contentions than the conclusory allegations of injury-in-fact in the initial complaint, the Court holds that Plaintiffs have failed to plead an

objectively reasonable "chilling" or self-censorship of their speech rights that would support their claim of standing to challenge the restrictions.[4]

### 1.   Law of Standing in First Amendment Cases

"The jurisdiction of federal courts is defined and limited by Article III of the Constitution." Flast v. Cohen, 392 U.S. 83, 94 (1968). Article III limits the federal courts to deciding cases or controversies; they do not issue advisory opinions. Id. at 96; see also Shenandoah Valley Network v. Capka, 669 F.3d 194, 202 (4th Cir. 2012). Even when a plaintiff is seeking declaratory relief, there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy." White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 913 F.2d 165, 168 (4th Cir. 1990) (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)). The doctrine of standing derives from this case or controversy requirement. See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 153 (4th Cir. 2000).

It is the burden of a party seeking a federal forum to establish the requirements of Article III standing. Bishop v. Bartlett, 575 F.3d 419, 424 (4th Cir. 2009) (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)). These requirements must be shown at each stage of litigation "with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. Accordingly, at the pleading stage, in determining whether the allegations in a complaint establish that the plaintiff has standing, a court will accept as true facts alleged but not legal conclusions. See id. Similarly the factual allegations that establish standing must be plausible on their face. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007).

---

[4] Because the Court holds that Plaintiffs lack standing to challenge the restrictions, it does not address Defendants' contention that the challenge to the restrictions is not ripe for adjudication.

The doctrine of standing requires that a party seeking a federal forum show (1) that it has suffered "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there is "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that a favorable result by the federal court would redress the injury. Cooksey v. Futrell, 721 F.3d 226, 234–35 (4th Cir. 2013) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

As Plaintiffs emphasize, the requirements of standing are relaxed somewhat in First Amendment cases. Cooksey, 721 F.3d at 235 (citing Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984)). This relaxation "manifests itself most commonly in the doctrine's first element: injury-in-fact." Id. In First Amendment cases, injury-in-fact may be established by a showing of "self-censorship" Id. (quoting Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011)). However, this self-censorship or "chilling" must have some objective manifestation. Id. at 236 (citing Laird v. Tatum, 408 U.S. 1, 13–14 (1972)). The chilling effect must also be "objectively reasonable." Id. (quoting Benham, 635 F.3d at 135).

Two recent Fourth Circuit cases illustrate what allegations of self-censorship are sufficient to survive a motion to dismiss for lack of standing in a First Amendment case. In Cooksey v. Futrell, Steve Cooksey, the operator of the website "Diabetes Warrior," brought a First Amendment challenge under 42 U.S.C. § 1983 alleging that the North Carolina Board of Dietetics/Nutrition ("State Board") had forced him to self-censor his website. 721 F.3d 226, 229 (4th Cir. 2013). The State Board was charged with administering North Carolina's Dietetic/Nutrition Practice Act, which forbids the unlicensed practice of dietetics. Id. at 230. The

11

Act gives the State Board the power to apply to the relevant court for an order enjoining violations of the Act. Id. at 231. Additionally, violations of the Act are misdemeanors. Id.

Prior to suit, the Executive Director of the State Board, Charla Burill, called Cooksey and told him that "he and his website were under investigation." Id. The State Board had received a complaint that Cooksey, through his website, was practicing dietetics without a dietitian's license. Id. at 230. Burill told Cooksey that the State Board tried to resolve these disputes informally. Id. at 231. He recommended that Cooksey move a disclaimer on his website to a more prominent position, which Cooksey did "without objection," and that he take down a section of his website, which he did "reluctantly." Id. Later, Burill emailed Cooksey print-outs from his webpage that had been marked in red pen. Id. at 231–32. The red pen review indicated sections that were "areas of concern" and contained commentary on how to comply with the Act. Id. at 232. Entire portions of the website were marked through with red X's. Id. The email "ask[ed]" Cooksey to "make any necessary changes to [his] site, and moreover, going forward, align [his] practices with the guidance provided." Id. at 231. The Board later sent a letter to Cooksey informing him that because of changes he had made to his website it found that he was now in "substantial compliance" with the Act and that it was closing the complaint. Id. at 232. However, the Board noted that it "reserve[d] the right to continue to monitor this situation." Id.

After receiving this letter, Cooksey filed suit alleging that the Board had violated his First Amendment rights. Id. at 232–33. The district court dismissed his suit for lack of standing because "plaintiff was not subjected to any actual or imminent enforcement of the Act." Id. at 233. The Fourth Circuit reversed and held that "Cooksey ha[d] sufficiently shown that he ha[d] experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board," and had thus adequately pleaded a First Amendment injury-in-fact.

Id. at 236–37. Cooksey had alleged that but-for the actions of the State Board he would not have made the changes to the website. Id. at 236. The Fourth Circuit held that this objective manifestation of chilling was objectively reasonable because "the State's Board's actions would be 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" Id. (quoting Benham, 635 F.3d at 135). The court emphasized that the Board had warned Cooksey of its statutory authority to seek an injunction, that the red-pen treatment of his webpage "surely triggered the same trepidation we all have experienced upon receiving such markings on a high school term paper," that the Board asked Cooksey to make changes consistent with the markings, and that the Board informed Cooksey that he would be monitored even after making the recommended changes to his website. Id. at 236–37. It was also of significance to the court that the Board's initial correspondence with Cooksey had been "unsolicited." Id. at 237.

The Fourth Circuit also held, *in the alternative*, that Cooksey had satisfied the injury-in-fact requirement of standing because he faced "a 'credible threat' of [criminal] prosecution" because of his First Amendment activities. Id. at 237–38 (quoting North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999)). Cooksey was not a licensed dietitian and the Act made it a misdemeanor for people without a dietitian's license to provide certain nutritional counseling. Id. at 238. The Board's correspondence was not irrelevant under this analysis: the Board's actions were evidence that the Act was not moribund and the threat of prosecution real. Id. at 237–38. Nevertheless, the key mechanism of chilling under this analysis was the prospect of criminal penalties rather than the threat of an injunction.

The Fourth Circuit also considered the chilling effect of possible criminal penalties in

Clatterbuck v. City of Charlottesville, which was decided shortly before Cooksey.[5] 708 F.3d 549 (4th Cir. 2013). Clatterbuck involved a challenge to a municipal ordinance that "prohibited individuals from soliciting immediate donations near two streets that run through the Downtown Mall in Charlottesville, Virginia." Id. at 551. The ordinance made it a Class 3 misdemeanor to solicit within fifty feet of the two streets when those streets were open to vehicular traffic. Id. at 551–52. The plaintiffs alleged that the ordinance restricted the free speech rights of individuals who regularly begged on the Downtown Mall. Id.

The city argued on appeal that the plaintiffs lacked standing to challenge the ordinance.[6] Id. at 553. Nothing in the Fourth Circuit's opinion indicates that the plaintiffs ever had been charged under the ordinance. See id. at 552 (describing the plaintiffs). Although the plaintiffs alleged that they were impecunious and regularly begged within the Downtown Mall, they did not allege that they had begged within the fifty foot buffer zones. Id. at 553. The city argued that because of this lack of specificity, plaintiffs had not alleged a concrete injury traceable to the ordinance. Id. at 553–54. The Fourth Circuit disagreed: Plaintiffs' allegations that the ordinance "restrict[ed] and deter[ed]" their begging activities on the Mall were enough to establish an injury-in-fact at the pleading stage. Id.

### 2. Analysis

In order to establish standing, Plaintiffs must allege with sufficient facts that their speech rights were chilled and that this chilling or self-censorship was both perceptible and objectively reasonable. See Cooksey, 721 F.3d at 236–37. The Court dismissed Plaintiffs' initial complaint because Plaintiffs failed to allege specific facts that they had suffered an injury-in-fact. Order,

---

[5] Clatterbuck was argued on December 5, 2012 and decided on February 21, 2013. 708 F.3d 549 (4th Cir. 2013). Cooksey was argued on May 15, 2013 and decided on June 27, 2013. 721 F.3d 226 (4th Cir. 2013).
[6] The District Court had found that there was standing but that the plaintiffs failed to state a cognizable First Amendment claim. Clatterbuck, 708 F.3d at 552. The city cross-appealed the standing determination. Id.

ECF No. 11 at 3. In more colloquial terms, the Court dismissed Plaintiffs' initial lawsuit because the Plaintiffs failed to allege that they were harmed in any way by the State programs and regulations that they sought to invalidate. They simply alleged that they had to "endure" and "contend with" overbroad, vague, and content based regulations. Id. (citing Compl. ¶ 22, ECF No. 1-1). In their First Amended Complaint, these conclusory allegations are repeated verbatim. See First Am. Compl. ¶ 25. To buttress their claim of an injury-in-fact Plaintiffs have added three paragraphs in which they attempt to plead that the various challenged restrictions have caused them to self-censor their brochures. Id. ¶¶ 22–24.

Plaintiffs again do not allege that Defendants have ever rejected or even threatened to reject one of Plaintiffs' guides for placement in the Welcome Centers. They do not allege that they have ever sought guidance from Defendants and were told that certain material they would like to publish would not be permitted. They have engaged in self-censorship, they allege, because "they do not feel able to risk various known and unknown consequences of being found in violation of the rules, including the damages to reputation and good will that will be caused if the plaintiffs solicit certain kinds of business from people and entities and then fail to deliver the promised products and services." Id. ¶ 24.

Because of these risks, "known and unknown," Plaintiffs allege that they have "engaged in self-censorship and have refrained from soliciting and distributing many forms of information and advertising that would help the plaintiffs generate profits . . . ." Id. ¶ 23. Plaintiffs then describe the forms of information and advertising they would like to solicit, all of which are prohibited by one of the challenged restrictions. Id. Taken alone, it is uncertain whether this allegation is sufficient to show that Plaintiffs have engaged in manifest self-censorship: Plaintiffs do not allege that they previously solicited this type of advertisement and have now stopped

because of the new restrictions. To show an injury-in-fact, Plaintiffs must show a change in behavior. However, at the motion to dismiss stage, the Court must draw inferences in favor of Plaintiffs and will infer a change in behavior.

In addition to alleging self-censorship, Plaintiffs also allege that they "may currently be in violation of the ban on religious advertisements because they generally list 'places of worship' and provide information that constitutes advertisement of religious entities, groups and facilities." Id. ¶ 22. As Defendants point out, there is some inconsistency in Plaintiffs' allegations that they engage in self-censorship because of the possibility of the enforcement of restrictions that they believe they might be already violating. See Mem. in Supp. of Mot. to Dismiss, ECF No. 15 at 10. This inconsistency is legally significant for two reasons. First, even at the pleading stage a district court is required to assess the plausibility of the factual allegations in the complaint. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). The continued publication of material suspected to be in violation of the restrictions undercuts Plaintiffs' claims that they have changed their behavior on account of the restrictions. However, this Court must also draw factual inferences in favor of Plaintiffs. Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). Plausible does not mean probable. Twombly, 550 U.S. at 556. It may be that Plaintiffs continued to provide information and advertisements that they had provided before the new restrictions were issued but have ceased to solicit new advertisements that might violate the new restrictions. This is plausible enough to survive a motion to dismiss.

Second, the inconsistency informs the Court's analysis of the reasonableness of the alleged self-chilling. Plaintiffs admit that their self-censorship was not the result of any actions taken or advice given by the State but solely a result of their knowledge of the restrictions and fear of the consequences of enforcement. The contrast with Cooksey is dramatic. In Cooksey,

North Carolina Board of Dietetics/Nutrition contacted Cooksey multiple times and suggested several specific changes to his website. Even after he made the changes, the Board "explicitly" warned him that they would continue to monitor the situation. Cooksey, 721, F.3d at 237. The Fourth Circuit held that it was reasonable for Cooksey to self-censor because of these actions of the Board. In this case, Plaintiffs have never had a publication rejected despite continuing to publish material they suspect may violate the restrictions. In the face of this complete inaction by the State, Plaintiffs' self-censorship, even if true, is unreasonable. If the Plaintiffs are worried about the consequences of rejection, they could seek guidance from the State before altering their business practices.

The Fourth Circuit's decision in Clatterbuck is not to the contrary. The destitute plaintiffs in Clatterbuck faced the threat of *criminal* prosecution if they begged within the prohibited zone. It was enough for them to establish an injury-in-fact to allege that they had changed their begging behavior on account of this risk. The only possible criminal sanction alleged in this case is a misdemeanor fine between $5 and $100 for a violation of 24 VAC 30-50-10. See ECF No. 12-6, Ex. F. at 2. Plaintiffs in their complaint point specifically to 24 VAC 30-50-10(L) as a restriction that might affect them. First Am. Compl. ¶ 15. This provision prohibits "threatening, abusive, boisterous, insulting or indecent language or gesture" within waysides and rest areas and also prohibits "oration, or other public demonstration" without prior permission. 24 VAC 30-50-10(L). Plaintiffs do not explain how their brochures might subject them to sanction under this provision and therefore do not link their alleged self-censorship to the threat of criminal prosecution.

In summary, Plaintiffs have failed to sufficiently plead that they have suffered an injury-in-fact on account of the restrictions on what may be placed in the Welcome Centers. Their

allegations of self-censorship fail to establish an injury-in-fact because the self-censorship is not reasonable in light of the absence of any past enforcement by the State. Because Plaintiffs have not pleaded an injury-in-fact, they lack standing to challenge the restrictions. The Court does not grant leave to amend a second time. No matter how Plaintiffs characterize their injury, the fact remains that they have never had a publication rejected by the State for inclusion in the Welcome Centers. No amendment would change this.

### B.   FIRST AMENDMENT: FEES

Plaintiffs also allege that the fees the State charges to place their publications in the Welcome Centers and Rest Areas are unconstitutionally excessive. Because the Plaintiffs have paid the fees, they have standing to challenge them, and the dispute is ripe. Plaintiffs ask this Court to declare that the State must allow Plaintiffs to display their guides in the Welcome Centers for free or at cost. First Am. Compl. at 21. Plaintiffs cite to no cases that support their contention that charging fees in excess of cost might run afoul of the First Amendment even if those fees are charged without regard to the content of the underlying speech. The cases cited to by Plaintiffs generally involve instances where the courts have invalidated content-based regulations or fees. See, e.g., Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015) (invalidating a city ordinance that regulated the display of outdoor signs based on their content).

Ultimately, the merits of this claim are irrelevant because the Welcome Center displays are government speech and not subject to First Amendment analysis: the First Amendment only regulates private speech. To one unfamiliar with recent Supreme Court precedent, this contention must seem strange. The brochures and pamphlets in the displays are produced by private groups who pay to place them in the Welcome Centers. A non-lawyer confronted with the resulting displays would be unlikely to conclude that they were government speech. However, the legal doctrine of government speech encompasses far more speech than any natural usage of the

18

phrase government speech would suggest. The facts of this case fall squarely within the doctrine as it has been expounded in recent Supreme Court cases.

### 1.   Government Speech

The government speech doctrine has evolved from a simple and uncontroversial premise: when the government speaks it may say what it wants. See Pleasant Grove City v. Summum, 555 U.S. 460, 467–68 (2009) (citing cases). This freedom necessarily extends to the government's ability to express views on contested matters; otherwise government could not function properly. Id. Time and appellate opinions have transformed this axiom into a diverse set of more controversial precedents that raise distinct conflicts between the right of free speech and the prerogatives of democratic governance.[7] The branch of the resulting evolutionary tree that directly covers the facts of this case began with the Supreme Court's decision in Pleasant Grove City v. Summum and continued with the Court's opinion in Walker v. Texas Division, Sons of Confederate Veterans, Inc. Both cases establish that a government, like private individuals, may "speak" in different ways and government speech thus come in unexpected forms

In Summum, a religious organization, the respondent Summum, challenged the rejection by Pleasant Grove City, Utah of its offer to donate a monument for placement in Pioneer Park, a 2.5 acre public park within the city's historic district. 555 U.S. at 464–66. The park had fifteen permanent displays, at least eleven of which were donated by private groups or individuals. Id. at 464. Among the displays was a Ten Commandments monument, which had been donated to the city in 1971. Id. at 465. The religious organization argued that by accepting the Ten Commandments monument and rejecting their proposed monument the City violated the Free

---

[7] For instance, in the present case the government speech doctrine forecloses a challenge to the government's management of speech activities in a publically accessible space. By contrast, in Johanns v. Livestock Marketing Ass'n, 554 U.S. 550 (2005), the Court held that the government speech doctrine foreclosed a claim of compelled funding of speech.

Speech clause of the First Amendment. Id. The proposed monument would be similar in size and nature to the Ten Commandments monument and would list the "Seven Aphorisms of SUMMUM." Id.

The religious organization urged the Court to hold that by accepting private monuments for inclusion in the park, the city had set up a traditional public forum. Id. at 478. Traditional public forums are those "'places which by long tradition or by government fiat have been devoted to assembly and debate,' such as streets and parks." Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch., 457 F.3d 376, 381 (4th Cir. 2006) (quoting Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 45 (1983)). The power of the state to limit expression in traditional public forums is very limited: "the state may only enact content-neutral 'time, place, and manner' restrictions or content-based rules that are 'necessary to serve a compelling state interest' and 'narrowly drawn to achieve that end.'" Id. (quoting Perry, 460 U.S. at 45). The Supreme Court has identified other types of forums, over which a government has more power to limit expression. See id. at 382–83. However, no matter the type of forum, a government's restrictions on private speech within the forum must be both reasonable and viewpoint neutral. Id. at 383.

The religious organization's argument in Summum was straightforward: Pioneer Park is a park and therefore a traditional public forum, and by accepting the Ten Commandments monument but not the monument listing the Seven Aphorisms, the City was engaging in viewpoint discrimination, which is impermissible no matter the type of forum. See Summum, 555 U.S. at 478. The Supreme Court rejected this characterization and held that the various monuments in the park were a form of government speech, not private speech. Id. at 478–81. Because the monuments were government speech, the religious organization had no claim under the First

Amendment, and therefore forum analysis did not apply. Id.

The Court began its analysis by emphasizing that a "government entity" has the "same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." Id. at 468 (citing Johanns v. Livestock Marketing Assn., 544 U.S. 550, 562 (2005)). A government may adopt privately created "speech" as its own. Of course, not all private speech that occurs on government property is government speech. If it were, forum analysis would never apply. See id. at 469. The question in Summum was whether in accepting the monuments the City was providing a forum for private speech or engaging in its own speech. See id. at 470. It was not irrelevant that private groups and individuals financed the production of some of the monuments and then donated them to the park: had the monuments been commissioned and financed by the city, there would be no question that they were government speech. Id.

Still, although the private financing of the monuments raised the question of whether forum analysis might apply, the unanimous Court thought the answer easy: "Permanent monuments displayed on public property typically represent government speech." Id. at 470; see also id. at 472 ("In this case, it is clear that the monuments . . . represent government speech."). The Court identified a long history of governments "us[ing] monuments to speak to the public." Id. at 470. Many monuments in this country, including the Statue of Liberty, have been "financed with private funds or donated by private parties." Id. at 471. Still, governments have been selective in accepting monuments and often exercise "editorial control" over them. Id. at 472. Finally, "[p]ublic parks are often closely associated in the public mind with the government unit that owns the land." Id. These governments accordingly take care to ensure that monuments convey messages appropriate to the places they are displayed. Id.

The Court also highlighted the adverse consequences that would arise if it applied forum analysis to monuments in a public park. Previously, forum analysis had been applied "in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." Id. at 478. Speakers and parades are temporary additions to a park. Id. At some point the "[s]peakers, matter how long-winded, eventually come to the end of their remarks;" the last parade float will eventually go by. Id. at 479. Monuments, by contrast, are permanent additions to a park, and a park can accommodate only a limited number. Id. at 478–79. To require the city to be viewpoint neutral in accepting monuments for the park would likely require the city to overload the park with permanent structures. Id. at 479–80. Faced with the choice of accepting every monument or accepting none, a city would likely take none. Id. at 480. "And where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." Id.

In Walker, the Court again had to decide whether to apply forum analysis or the government speech doctrine to a First Amendment challenge. 135 S.Ct. at 2246. The Sons of Confederate Veterans had challenged the Texas Department of Motor Vehicles Board's rejection of their proposed specialty license plate design. Id. at 2243–44. The Sons argued that in setting up a process by which specialty license plates designs were proposed by private parties and approved by the Board, Texas had created a forum for private speech.[8] Id. at 2250. The Court disagreed and held that its "precedents regarding the government speech . . . provide[d] the appropriate framework through which to approach the case." Id. at 2246.

In deciding that specialty license plate designs were a form of government speech, the

---

[8] There are other ways by which a specialty license plate design may be created in Texas, including by legislative act. See Walker, 135 S.Ct. at 2244–45 (describing the various ways specialty license plates are created). The First Amendment challenge and the Court's analysis focused on this particular method of creating specialty plates.

Court explicitly considered the same three factors it had identified in <u>Summum</u>: (1) whether, historically, the government had used this means of expression—license plates—to convey governmental messages; (2) whether the public associated the means of expression with the government; and (3) whether the government exercised editorial control over the messages conveyed. <u>Id.</u> at 2247–50. Answering yes to each, the Court held that specialty license plates were a form of government speech immune from First Amendment challenge. <u>Id.</u> at 2248–50.

As in <u>Summum</u>, the Court in <u>Walker</u> also articulated reasons why forum analysis would be "misplaced." <u>Id.</u> at 2250–52. It explained how each type of government forum was inapposite to specialty license plates. <u>Id.</u> Many of the factors the Court considered in so concluding were the same as the factors the Court considered in concluding that the plates were government speech. <u>See, e.g.</u>, <u>id.</u> at 2251 (holding that the license plates were not "either a designated public forum or a limited public forum" in part because "the State exercises final authority over each specialty design"). Additionally, the Court reiterated that "[t]he fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." <u>Id.</u> The Court noted that forum analysis—in banning any type of viewpoint discrimination—might force the State to authorize a burdensome number of specialty plates, just as in <u>Summum</u> forum analysis might have forced the State to permit an unsightly number of monuments. <u>Id.</u> at 2251–52. Lastly, it was not enough that the State profited by charging drivers to display specialty plates. Id. at 2252.

Since <u>Walker</u>, the Courts of Appeal have applied the three <u>Summum</u>/<u>Walker</u> factors to aid them in differentiating private and government speech. <u>See, e.g.</u>, <u>Mech v. Sch. Bd. of Palm Beach Cty.</u>, 806 F.3d 1070 (11th Cir. 2015) (holding that banners advertising private business that were placed in school fences were a form of government speech); <u>United Veterans Mem'l &</u>

Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle, 615 F. App'x 693 (2d Cir. 2015) (holding that the flags hung on a flagpole that sat on public property were government speech).

Between the Supreme Court's decisions in Summum and Walker, the Seventh Circuit decided a case with facts similar to those considered here. Illinois Dunesland Pres. Soc'y v. Illinois Dep't of Nat. Res., 584 F.3d 719 (7th Cir. 2009). The plaintiff in the case, the Illinois Dunesland Preservation Society, sought to place a two-page pamphlet in the displays racks that were present in various buildings in the Illinois Beach State Park. Id. at 721. The display racks contained "a variety of brochures and flyers" that were selected by Park Officials. Id. at 722. The plaintiff's pamphlet, described by the Seven Circuit as "scary," warned of asbestos in the park and suggested ways to minimize exposure. Id. at 721.

The plaintiff argued that by rejecting the pamphlet for inclusion in the display racks, the State defendants had violated their First Amendment rights. Id. It argued that in setting up the display racks the State had created a forum for private speech. See id. at 722. The defendants argued that the display racks were government speech, immune from First Amendment challenge. Id. at 724. The Seventh Circuit agreed with defendants that plaintiff had failed to state a First Amendment claim; however, the court was somewhat equivocal about the precise doctrine it relied upon in reaching this holding. See id. at 724–26. Writing for the unanimous panel, Judge Posner dismissed the "barrage of unhelpful First Amendment jargon" drawn from Supreme Court opinions that the parties had, understandably, used. Id. at 722. Rather than say outright that the material in the display racks was "government speech," Judge Posner explained why the State should not have to include the pamphlet in the display racks. See id. at 724–26. In doing so he relied on—and cited to—the Supreme Court's reasoning in Summum, where, as just

24

discussed, the Court had held that park monuments were government speech. See id.

Judge Posner explained that the State had chosen materials for display racks so as to attract people to the park. Id. at 725. The plaintiff's pamphlet contained a different message: this park is dangerous. Id. Although defendants could counter this message with another pamphlet, "the mere display" of the plaintiff's pamphlet would give it legitimacy. Id. Furthermore, such arguments and response by pamphlet would eventually lead to over-crowded racks. Id. Similar to the Supreme Court's prediction in Summum that the city would stop accepting monuments if it had to accept them all, Judge Posner speculated that the State might eventually decide to stop using the racks rather than permit a library of argumentative pamphlets. Id. (citing Summum, 129 S. Ct. at 1138).

### 2. Analysis

The Court's analysis of the present controversy begins with the three factors laid out in Summum and Walker. The first factor asks whether the State has used the displays in the Welcome Centers to convey governmental messages. As Plaintiffs say in their complaint "Virginia's welcome centers and rest areas have existed for a variety of purposes, including dissemination of information [and] promotion of tourism . . . ." First Am. Compl. ¶ 11. It is of no consequence that one way that Virginia has disseminated this information is through private advertisements. The State may adopt these advertisements as its own speech just as in Summum Pleasant Grove City adopted the donated monuments as its own. Even though the State may profit from the fees it charges to place materials in the Welcome Centers, the State still uses the program to convey a governmental message. See Walker, 135 S.Ct. at 2252 (holding that specialty license plates were government speech even though the State may have profited from the sale of them).

The second factor asks whether the Welcome Centers "are closely identified in the public

mind" with the State. Id. at 2248 (quoting Summum, 555 U.S. at 472). As Defendants put it, the Welcome Centers "are literally 'Welcome Centers' for the Commonwealth." Mem. in Supp. of Mot. to Dismiss, ECF No. 15 at 16. They are attached to public roads, chiefly interstate highways, and are likewise connected in the public mind with the state and federal governments that maintain such roads. It is of no consequence that the challenged restrictions prohibit advertisers from suggesting that the State endorses their product. See First Am. Compl. ¶¶ 14, 16. As the *dissent* in Walker pointed out, no one would think that the State of Texas endorsed the University of Oklahoma Sooners just because Texas had allowed a specialty license plate with the University's name. Walker, 135 S.Ct. at 2255 (Alito, J., dissenting). For the majority it was enough that license plates were associated with the State. See id. at 2248–49.

The third factor asks whether the State exercises editorial control over the content of the speech, in this case the Welcome Center displays. As Plaintiffs discuss at length in their complaint, the State has set forth extensive requirements for what material may be placed in the Welcome Centers. First Am. Compl. ¶¶ 14–18. Through these requirements the State exercises editorial control. Additionally, the State, through the Virginia Tourism Corporation, retains final approval authority over the advertisements or brochures placed in the Welcome Centers.[9] Id. ¶ 19.

In sum, the Welcome Center displays meet all three of the factors that Summum and Walker considered in deciding that the speech at issue in those cases was government speech. Taken alone, however, these factors may not adequately explain why Plaintiffs fail to state a First Amendment claim. The third factor especially is frustratingly circular. Plaintiffs cannot

---

[9] A government may act through intermediaries in creating, editing, and disseminating government speech. See Johanns v. Livestock Marketing Ass'n, 544 U.S. 550, 560–61 (2005) ("When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages.").

challenge the government's regulation of the Welcome Center displays because the displays are government speech. Why are they government speech? Because the government regulates them. Subtler minds may quarrel with this analysis. The fact remains however that while the three factors may help explain why the Welcome Center displays are considered government speech, they do not explain why such speech should be immune from First Amendment challenge.

Accordingly, it would be elucidating to explain the perverse consequences of applying First Amendment doctrine to the Welcome Center displays. The Supreme Court similarly explained why forum analysis would be misplaced in both Summum and Walker. Although the plaintiffs here only have standing to challenge the fees charged by the State, if the Welcome Center displays were not government speech, they would be subject to a First Amendment challenge, by a plaintiff with standing, on account of the restrictions on what materials may be placed there. The Court must consider this possibility in determining whether the Welcome Center displays are government speech, no matter what First Amendment injury is being alleged.

If forum analysis applies to the Welcome Centers, no matter what type of forum the Welcome Centers might be, the State would not be able to engage in viewpoint discrimination in determining what advertising materials could be placed there. The State would not be able to limit advertisements to those that promote Virginia destinations, as it currently does. See First Am. Compl. ¶¶ 14, 16, 18. The State would be forced to allow advertisements that disparaged Virginia's many wonderful attractions. It would be forced to display advertisements that suggested that Maryland and North Carolina were more worthy travel destinations. Allowing such material would undermine the entire purpose of the Welcome Center displays. Cf. Illinois Dunesland Pres. Soc'y, 584 F.3d at 725 (noting how allowing pamphlets critical of the park would undermine the State's intended message). The government speech doctrine preserves the

State's ability to promote itself through means such as the Welcome Center displays.

To maintain viewpoint neutrality the State would not only have to allow views that undermined the purpose of the displays, it would also have to allow more advertisements and brochures than the Welcome Centers could coherently contain. Advertisements for jet skiing would have to be countered with pamphlets warning of the dangers of such sport and, maybe, of the carbon footprint of such gratuitous fun. The Seventh Circuit, relying on Summum, made a similar argument in Illinois Dunesland Preservation Society: parks can only hold so many monuments; display racks can only hold so many brochures. Plaintiffs here also argue the State must allow the brochures to be placed in the racks for free. Such a system of free, unregulated display would undermine the purpose of the Welcome Centers and lead to an incoherent cacophony of "speech" that would not serve the interests of the State or the advertisers.

In allowing private parties to place brochures and other advertisements in the Welcome Centers the State is conveying a governmental message. It is promoting the many attractions that Virginia has to offer. Because the displays are government speech, they are not subject to First Amendment analysis. Accordingly, Plaintiffs do not state a claim for relief with their allegation that the excessive fees charged to place materials in the Welcome Centers violate their First Amendment rights.

### C.   DUE PROCESS, EQUAL PROTECTION, AND STATE LAW CLAIMS

Plaintiffs also allege violations of the due process clause, equal protection clause, and the Virginia State Constitution, and refer to inconsistences in the Virginia laws that govern the Welcome Centers. First Am. Compl. ¶¶ 15, 17, 20–21. Most of these alleged violations relate to Plaintiffs' challenge to the various restrictions on what materials may be placed in the Welcome Centers and Rest Areas. For instance, the due process claims relate to the process by which materials are approved for inclusion in the Welcome Centers. Id. ¶¶ 17, 20–21. As discussed,

28

Plaintiffs lack standing to challenge the restrictions on what may be placed in the Welcome Centers. Similarly, Plaintiffs lack standing to challenge the process by which materials are approved or denied for inclusion. Plaintiffs have never had anything rejected by the State for inclusion in the Welcome Centers and so have never suffered an injury-in-fact on account of the process by which materials are approved for placement. Accordingly, this Court does not reach their due process claims, whether brought under the Federal or State Constitution.

Plaintiffs' allegations of inconsistencies in Virginia state law also concern the restrictions on what materials may be placed in the Welcome Centers. Plaintiffs allege that the various documents that they allege control what may be placed in the Welcome Centers are inconsistent with 24 VAC 30-151-670(2) and 24 VAC 30-50-10(L). First Am. Compl. ¶¶ 12, 15. The State argues that 24 VAC 30-151-670(2) does not apply to Welcome Centers. Mem. In Supp. of Mot. to Dismiss, ECF No. 15 at 21–22. Furthermore, this Court is reluctant to address matters of state law when Plaintiffs either lack standing or fail to state a claim for relief with regard to their Federal claims. More fundamentally, Plaintiffs lack of standing to challenge the restrictions on what may be placed in the Welcome Centers and so cannot challenge in this Court these alleged inconsistencies regarding what may be placed there. Whatever rules govern the Welcome Centers, Plaintiffs have never been in violation of those rules.

Plaintiff make but one cursory reference to a violation of the equal protection clause. First Am. Compl. ¶ 17. The reference is contained in a sentence in which Plaintiffs make allegations concerning the process and standards by which materials are approved for inclusion in the Welcome Centers. See id. Again, Plaintiffs lack standing to bring this claim.

Finally, Plaintiffs allege violations of the Free Speech provisions of the Constitution of Virginia. Id. ¶ 17. However, the free speech protections in the Constitution of Virginia are

"coextensive with the free speech provisions of the federal First Amendment." Elliott v. Com., 267 Va. 464, 473-74, 593 S.E.2d 263, 269 (2004). Plaintiffs either lack standing or fail to state a claim for relief under both the State and Federal Constitutions.

## IV.   CONCLUSION

In sum, Plaintiffs have again failed to establish that they have standing to challenge the policies governing what may be displayed in the Welcome Centers and Rest Areas. Plaintiffs have standing to challenge the fees charged for placing materials in the Welcome Centers. However, the Court now holds that the Welcome Center displays are government speech exempt from First Amendment challenge. It follows that Plaintiffs do not state a claim for relief in their challenges to the fees. Accordingly, the Court **GRANTS** the Motion to Dismiss. ECF No. 14. The Court need not and does not reach Defendants' other defenses. The Court does not grant leave to amend a second time. Accordingly, the present action is **DISMISSED** with prejudice.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
March 18, 2016

30